JUDGE BRODERICK

Kenneth J. Katz
Nicole D. Grunfeld
KATZ MELINGER PLLC
280 Madison Avenue, Suite 600
New York, New York 10016
Telephone: (212) 460-0047
Facsimile:  (212) 428-6811
*Counsel for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILIPPA OKOYE f/k/a PHILIPPA JAYNE BURKE,

      Plaintiff,

      -against-

DEVERE GROUP LTD., DEVERE USA, INC., and
BENJAMIN ALDERSON,

      Defendants.

Civil Action No.

COMPLAINT

Plaintiff, Philippa Okoye f/k/a Philippa Jayne Burke, by her attorneys Katz Melinger

PLLC, complaining of Defendants, deVere Group Ltd., deVere USA, Inc., and Benjamin

Alderson (collectively, "Defendants"), states, upon information and belief, as follows:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to the New York City Human Rights Law, N.Y.C.

Administrative Code Title 8 (NYCHRL), and any other cause of action which can be inferred from

the facts set forth herein.

2.      The jurisdiction of this Court is invoked under 28 U.S.C. § 1332.

3.      Venue is proper pursuant to 28 U.S.C. §1391, as a substantial part of the events

giving rise to Plaintiff's claims occurred in this district.

4.      Within 10 days of the filing of this Complaint, Plaintiff will serve copies of this Complaint pursuant to NYCHRL, §8-502.

## PARTIES

5.      At all relevant times Plaintiff Okoye was a resident of the State of New York until on or about February 2014, and subsequently was, and still is, a resident of the State of California.

6.      At all relevant times Defendant, deVere USA, Inc., was, and still is, a foreign business corporation, authorized to do business in New York.

7.      At all relevant times Defendant, deVere Group Ltd., was, and still is, a foreign business corporation that transacts business in New York.

8.      During all relevant times Okoye was an employee of deVere USA, Inc. as defined by the NYCHRL.

9.      At all relevant times deVere USA, Inc. had in excess of 20 employees and was an employer as defined by the NYCHRL.

10.     Upon information and belief, deVere USA, Inc. is a subsidiary of deVere Group Ltd.

11.     Upon information and belief, all or substantially all personnel matters of deVere USA, Inc., including discipline and termination of employees, were handled by deVere Group, Ltd. at its office in Malta, located at Centre Point, 1st Floor, Dun Karm Street, Birkirkara By Pass, Birkirkara BKR903.

12.     Upon information and belief, deVere Group Ltd. was responsible for setting schedules and day-to-day activities for employees of deVere USA, Inc., including Plaintiff, and supervising their performance.

13.     Upon information and belief, deVere Group, Ltd. processed all deals through its office in Malta. Each day, Plaintiff and other employees of deVere USA, Inc. input their data into a global database system to be reviewed by deVere Group Ltd.

14.     Upon information and belief, deVere Group, Ltd. was responsible for compensating all employees working in deVere USA, Inc.'s New York office.

15.     The deVere Defendants are joint employers under the NYCHRL, and are jointly and severally liable in this matter.

16.     At all relevant times Defendant Alderson was, and still is, a resident of the State of New York.

17.     At all relevant times Defendant Alderson was the Chief Operating Officer of deVere USA, Inc. and Senior Area Manager of deVere Group, Ltd., and was Okoye's supervisor.

## FACTS

18.     Ms. Okoye is a British citizen currently residing in California.

19.     On or about October 2013, Okoye was hired by deVere Group Ltd., at its corporate headquarters in the country of Malta, and was assigned to work at the New York office of deVere USA, Inc., located at 767 Third Avenue, 6th Floor, New York, New York 10017.

20.     Upon information and belief, no employee of deVere USA, Inc.'s New York office was involved in the decision to hire Okoye.

21.     When Okoye began working in the New York office, she was the only female in an office of approximately 21 employees.

22.     Okoye worked as a Senior Investment Adviser from October 2013 until February 2014, when she was demoted to the position of Coordinator.

23.     Okoye's primary duties as a Senior Investment Adviser were to contact expatriated citizens from the United Kingdom residing in the United States, and to provide them with financial planning services with regard to their British pension plans.

24.     As a Coordinator, her responsibilities were reduced such that she only set up meetings between clients and her Senior Investment Adviser, but would not participate in such meetings.

25.     From the onset and throughout Okoye's employment, Alderson made it known that he wanted "to model [their] office on the 'Boiler Room' and 'Wolf of Wall Street'" films.  In those films, employees of male-dominated investment firms used highly offensive language and engaged in extremely inappropriate conduct, including sexual harassment and drug and alcohol use in the workplace.

26.     From the onset of her employment, the male employees, led by Alderson, made inappropriate and offensive sexual comments and degrading remarks about women to Okoye and to others in Okoye's presence.

27.     On her first day of work, Alderson and other male employees made repeated comments in Okoye's presence that they would have to "act right now that there's a woman in the office" and that they "can't have fun anymore" since Okoye joined the office.

28.     That same day, while in the main area of the office and in front of all of the employees, Alderson exclaimed, "This is why I didn't want a woman, because they can't take the banter."

29.     Alderson continued this theme by asking Okoye, "So can you handle the banter or are you going to be a woman about it and be sensitive?"

30.     From her very first day and throughout her employment at deVere USA, Inc.'s New York office, Okoye was subject to offensive and derogatory remarks on a daily basis, and frequently multiple times per day.

31.     Many of Alderson's offensive and derogatory remarks to or about Okoye were made on the main floor of the office in front of the entire staff.

32.     After a few weeks, Okoye told Alderson that she felt that the environment in the office was not very professional. Alderson responded, again in front of the entire office, that "This is a sales floor and all sales environments are like this – if you don't like it then you should go elsewhere." Bradley Hamilton, Area Manager and Senior Investment Adviser, vocalized his agreement with Alderson's assessment.

33.     In November 2013, Alderson and other male employees began making lewd and racist remarks about Okoye's relationship with her then-boyfriend and current husband, Lawrence. Lawrence is African-British and lives in California, where he plays football professionally.

34.     While sitting at her desk, Okoye overheard an employee remark, "I think it's disgusting when white women go out with black guys." The comment was said loudly and was clearly intended for Okoye to overhear.

35.     Also in November, Zachary Evans, a co-worker, approached Okoye on the main office floor and said to Okoye, "Don't change your surname [to Okoye] if you marry Lawrence because people will think you're black." Alderson, who heard Evans' comment, replied, "Yeah, and that's not good for business."

36.     On another occasion, Alderson asked Okoye, "Do you have a loose vag from taking your boyfriend's big black c*ck?" This same comment was made frequently both to Okoye's face

and behind her back loudly enough that she could still clearly hear it.

37.     Alderson taunted Okoye by claiming that Lawrence was cheating on her.  On multiple occasions, Alderson asked Okoye, "How many times has big Lawrence cheated on you?"  Alderson also told Okoye, "You're pretty stupid if you think he's being faithful to you in California when you're all the way over here."

38.     On two occasions, Alderson came out of his office and, in front of the entire staff, shouted, "So Philippa, how many cheerleaders has your boyfriend f*cked today?"  On another occasion, Alderson said, "It's lunchtime in San Francisco now, Lawrence is probably f*cking a cheerleader on his lunch break."  When Okoye complained to Alderson about his comments, Alderson simply responded with, "He's probably f*cked the whole cheerleading squad by now."

39.     One evening in December 2013, Alderson approached Okoye's desk and asked her, "So how big is Lawrence's d*ck?"  When Okoye didn't respond, Alderson laughed and said, "I bet it's f*cking huge.  Do you take his big black n*gg*r d*ck up your ass?"

40.     On or around December 13, 2013, the office held its Christmas party. Okoye had initially declined, but because Alderson told her that she was "so boring," she decided to attend.  Then, at the party, Okoye overheard Alderson and Bennett Linsky, a Client Associate, discussing when they thought Okoye would finally "f*ck off so that [they] could get on with their night."

41.     When Okoye came into the office the following Monday, December 16, 2013, Linsky shouted at her across the office, "Sh*t stirring bitch, you should f*ck off!"  Okoye told Linsky to shut up and then started to cry.

42.     Alderson called Okoye into his office and reprimanded her for shouting at Linsky, but did not reprimand Linsky for his comment to Okoye.

43.     Later that day, Okoye was called into the conference room with Alderson and Andoni Yturralde, Head of Private Client Business.  During this conversation, Alderson made several comments in an attempt to make Okoye quit her job.

44.     During the meeting, Okoye was told, "You cry too much and should f*ck off back to England and work in HR where you can work with women and you can all cry together all day."  Alderson continued, "This is how it is working in this environment" and told Okoye that if she didn't like it, she should "f*ck off back to England."  Okoye began to cry, and told Alderson that he was not allowed to speak to her that way, to which Alderson merely replied, "Oh stop! For f*ck's sake I can speak to you how I like, I'm the f*cking CEO.  If you don't like it, leave!"

45.     Okoye told Alderson that she had no intention of leaving, and that she was determined to succeed in her role.  Alderson responded, "But you don't need to work, you have Lawrence and he's in the NFL, he can support you."

46.     Before the meeting adjourned, Alderson verbally attacked Okoye once more, telling her that, "No one in the office likes you! You've rubbed everyone up the wrong way! Everyone hates you!"  When Okoye asked Alderson why everyone felt that way, Alderson replied, "You're not strong enough for this job and I don't think it's for you.  You're too nice to be in sales."

47.     As a result of Alderson's comments, Okoye again became physically upset.  When Alderson saw Okoye's reaction, he shouted, "See! I can't say anything to you women without you crying, it's a joke!"  Alderson then shook his head and looked at Yturralde and complained, "This is why I didn't want women in the office."

48.     When Okoye returned to work in January 2014 after the Christmas break, without further explanation, Alderson removed Okoye from her sales position and made her a Coordinator.

49.     Alderson told Okoye that she would now report directly to Yturralde, and that her salary would be reduced by 37.5% as a result of her demotion.

50.     Also starting in January, Okoye was met with new forms of harassment when she returned to the office.

51.     Despite hoping for a fresh start with her co-workers in the New Year, Okoye was quite literally given the "silent treatment" and largely ignored by the majority of her colleagues around the office.

52.     Alderson did not ignore Okoye, but decided to change the subject of his endless harassment and began to taunt Okoye for her religious beliefs.

53.     On several occasions, Alderson called Okoye, a practicing Christian, a "Bible basher" and referred to Okoye as such in a mocking tone to others in Okoye's presence.

54.     Alderson also constantly commented on Okoye attending church and made derogatory remarks about her faith.

55.     Alderson would make comments to Okoye such as asking her if she had her bible on her, or if she had read the bible that day.

56.     When Alderson learned that Lawrence was also religious, Alderson began mocking their religious beliefs daily.  Alderson would sing "hymns," such as "I love going to church and Jesus" and "oh praise Jesus," as he walked by Okoye's desk.

57.     Alderson made these comments in the presence of others, causing Okoye further humiliation and embarrassment.

58.     In addition to his ceaseless offensive and inappropriate remarks to and about Okoye, Alderson openly tolerated and even promoted a culture of illegal narcotic use in the office.

59.     Within her first month of work, Okoye overheard numerous discussions among employees about cocaine and how it was the only way to manage the hours that the job requires. When Okoye told her colleagues that she didn't use recreational drugs and never had, she was mocked and ridiculed.

60.     In February 2014, Okoye was looking for an envelope in one of the communal drawers when she found a large bag of marijuana.

61.     When Okoye pointed out the bag to Eric DiAndra, who sat at the desk next to the drawer, DiAndra laughed. Okoye then told Yturralde, her manager, about the marijuana, and he too laughed and took no further action. When Okoye complained that it was inappropriate to have illegal substances in the office, she was laughed at once more.

62.     When women came into the office, Okoye heard employees discussing whether they would "f*ck her" or not. The employees instantly sexualized these women, often making degrading comments about them such as "her t*ts are too small" or "she's too fat" within earshot of Okoye and other employees.

63.     Male employees also engaged in loud daily conversations about sex, strippers and prostitutes.

64.     Male employees, particularly those who drank and did illegal narcotics with Alderson after work, were held to a lower professional standard than Okoye.

65.     For instance, at each weekly meeting, Alderson recounted how many sales meetings each employee had obtained over the prior week. If Okoye had performed poorly the previous week, she was chastised by Alderson, while male employees who performed similarly were not.

66.     During one week, Okoye surpassed the record number of sales meetings in a week. At the next weekly meeting, Alderson did not announce the meeting count that week, despite it being his regular routine.

67.     As a result of the daily harassment she faced, Okoye dreaded going to the office each day.  She cried each morning on the way to work, and again each evening after leaving work. She felt constant unease, stress and anxiety at work, and called Lawrence and her friends daily to complain about the working conditions.

68.     Okoye finally worked up the nerve to complain about the working conditions and Alderson's treatment of her to Yturralde, her manager.  Yturralde acknowledged that Alderson's actions were deplorable and would not be tolerated at any other financial institution at which he had previously worked, but told Okoye that there was nothing that could be done.

69.     When Okoye investigated how she could make a formal complaint about Alderson and the other employees in the New York office, she discovered that deVere USA, Inc. did not have a Human Resources department in New York, or anywhere in the United States, to which she could file a complaint.

70.     Upon information and belief, all of deVere Group Ltd.'s HR matters were handled centrally from its headquarters in Malta.

71.     Upon information and belief, deVere USA, Inc. had the capacity to monitor all employee emails sent or received in its offices and on company e-mail addresses.  When Okoye learned of this, she feared that any complaint against Alderson, the highest ranking employee in the United States, would result in her termination.  Were Okoye to be terminated, her visa would no longer be valid and she would be forced to return to England.

72.    With no hope of resolving the situation and no end to the harassment in sight, Okoye spent many of her lunch breaks crying alone in the bathroom as a result of the stress and anxiety of her work environment.

73.    Alderson's incessant comments about Lawrence also made Okoye feel insecure and paranoid, and put a severe strain on her relationship with Lawrence.

74.    Okoye was terrified of going to work each day, and finally felt as though she could no longer remain in the New York office.

75.    In February 2014, Yturralde allowed Okoye to move to California and work remotely from Lawrence's home due to the stress Okoye was experiencing while working in the New York office.

76.    Within a few months of moving to California, Okoye was terminated by Yturralde. Upon information and belief, Alderson instructed Yturralde to terminate Okoye.

77.    While Okoye was told that the reason she was fired was for performance reasons, this was pretextual.  Okoye performed her job satisfactorily, but was given tasks outside of the scope of her duties which interfered with her ability to perform the essential functions of her job.

78.    There was no legitimate business reason for Okoye to be terminated; rather, she was terminated because she is a women who objected to being sexually harassed.

79.    Due to the stress, depression, humiliation and other emotional distress Okoye suffered, she has been prescribed medication for the anxiety and high blood pressure she experiences as a result of the way she was treated by Defendants.

80.    As a result of the foregoing, deVere USA, Inc. and deVere Group Ltd. have violated the New York City Human Rights Law.

## AS AND FOR A FIRST CAUSE OF ACTION

*(New York City Human Rights Law, N.Y.C. Administrative Code Title 8)*
(Sexual Harassment-Hostile Work Environment)

81.     Plaintiff repeats and realleges all prior allegations.

82.     Alderson and other employees of the deVere Defendants, through lewd remarks about Okoye's sexual relationship with her then-boyfriend and current husband, Lawrence; inappropriate comments about the physical appearance of women who visited the office; and daily discussions about sex, strippers and prostitutes, created a hostile work environment and caused Okoye to suffer constant discomfort and anxiety in her place of employ.

83.     The actions of Alderson, Hamilton, and other employees of the deVere Defendants made Okoye uncomfortable, gave her anxiety, and caused her emotional distress.

84.     The deVere Defendants are liable because Alderson, Hamilton and other employees who harassed Okoye were Okoye's supervisors with immediate, or successively higher, authority over her or exercised managerial or supervisory responsibilities.

85.     The deVere Defendants encouraged, condoned, or approved of the discriminatory conduct by its employees.

86.     The deVere Defendants, by themselves or through Alderson, Yturralde, and Hamilton, each of whom exercised managerial or supervisory responsibilities, knew of the discriminatory conduct and failed to take immediate and appropriate corrective action.

87.     The deVere Defendants knew or should have known of the discriminatory conduct by Alderson, Hamilton and other employees and failed to exercise reasonable diligence to prevent such discriminatory conduct.

88.     The deVere Defendants are liable for Alderson, Hamilton and other employees'

actions, which created a hostile work environment in which Okoye was victimized and treated less well than her male counterparts.

89.     As a result of Defendants' actions, Okoye was intimidated and scared that she would face a change in her working conditions, through termination, reduction of hours, or other actions that would affect her employment and future career and could include being deported to England while Lawrence remained in California.

90.     Defendants' actions were specific and related instances of discrimination which remained unremedied and amount to a continuous practice and policy of discrimination by Defendants.

91.     As a result of the foregoing, Okoye has been denied employment; has lost wages, benefits, promotional opportunities and bonuses; has suffered mental anguish, humiliation, embarrassment, emotional injury, emotional distress and loss of enjoyment of life; and has incurred damages thereby.

92.     The conduct of Defendants was outrageous; was done in a malicious manner intended to injure Okoye; and was done in conscious disregard and reckless indifference to Okoye's protected civil rights, entitling her to an award of punitive damages.

93.     The aforementioned conduct by Defendants is without just and reasonable cause and constitutes unlawful sexual harassment in violation of NYCHRL.

94.     Judgment should be entered in favor of Okoye and against Defendants on the First Cause of Action for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION

*(New York City Human Rights Law, N.Y.C. Administrative Code Title 8)*
(Gender-Based Discrimination)

95.      Plaintiff repeats and realleges all prior allegations.

96.      Alderson and other employees of the deVere Defendants constantly berated Okoye because of her gender and accused her of being incompetent as a Senior Investment Adviser based on offensive gender stereotypes such as being too nice and too sensitive to work in sales, rather than basing their evaluations on her performance.

97.      Okoye was the subject of reproach during weekly meetings for her "poor" performance, despite having meeting counts similar to those of her male counterparts, who were not openly criticized.   When Okoye's performance exceeded that of her make colleagues, Alderson refused to address the weekly count during the meeting.

98.      Defendants treated Okoye less well than her male coworkers on the basis of her gender, in violation of NYCHRL.

99.      Judgment should be entered in favor of Okoye and against Defendants on the Second Cause of Action for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
*(New York City Human Rights Law, N.Y.C. Administrative Code Title 8)*
(Race-Based Discrimination)

100.    Plaintiff repeats and realleges all prior allegations.

101.    Alderson and other employees of the deVere Defendants made repeated comments about Lawrence's physical features, and highly offensive comments about Okoye's personal and sexual relationship with Lawrence, based on Lawrence's race.

102.    Defendants treated Okoye less well than her coworkers on the basis of her then-boyfriend and current husband's race, in violation of NYCHRL.

103.    Judgment should be entered in favor of Okoye and against Defendants on the Third Cause of Action for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
*(New York City Human Rights Law, N.Y.C. Administrative Code Title 8)*
(Religion-Based Discrimination)

104.    Plaintiff repeats and realleges all prior allegations.

105.    Alderson mocked and ridiculed Okoye based on her Christian faith, sometimes singing made-up hymns using religious slurs in and around Okoye's work area.

106.    Defendants treated Okoye less well than her coworkers on the basis of her religion, in violation of NYCHRL.

107.    Judgment should be entered in favor of Okoye and against Defendants on the Fourth Cause of Action for all compensatory, emotional, physical, liquidated, and punitive

damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION

*(New York City Human Rights Law, N.Y.C. Administrative Code Title 8)*
(Retaliation)

108.    Plaintiff repeats and realleges all prior allegations.

109.    When Okoye complained about the harassment and discrimination to which she was subjected, Defendants demoted her and reduced her salary.

110.    The Defendants' retaliatory treatment of Okoye was in violation of NYCHRL.

111.    Judgment should be entered in favor of Okoye and against Defendants on the Fifth Cause of Action for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests, pursuant to FRCP 38 (b), a jury trial on all claims so triable.

**WHEREFORE**, Plaintiff Okoye, prays for judgment as follows:

a)   On the First Cause of Action in favor of Okoye and against Defendants for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial;

b)   On the Second Cause of Action in favor of Okoye and against Defendants for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial;

c)   On the Third Cause of Action in favor of Okoye and against Defendants for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial;

d)   On the Fourth Cause of Action in favor of Okoye and against Defendants for all compensatory, emotional, physical, liquidated, and punitive damages, if applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial;

e)   On the Fifth Cause of Action in favor of Okoye and against Defendants for all compensatory, emotional, physical, liquidated, and punitive damages, if

applicable, along with lost pay, front pay, reasonable attorney fees, the costs and disbursements of this action and any other damages permitted by law in an amount to be determined at trial;

f) interest;

g) and such other and further relief as the Court shall deem just and proper.

Dated:   May 15, 2015

By: _____
   Kenneth J. Katz
   Attorney for Plaintiff
   Katz Melinger PLLC
   280 Madison Avenue, Suite 600
   New York, NY 10016
   (212) 460-0047